IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 4, 2025

IN RE NEYRA S.

**Appeal from the Juvenile Court for Hamblen County**
**No. TR240013        Blake E. Sempkowski, Judge**

_____

**No. E2025-00422-COA-R3-PT**

_____

The Juvenile Court for Hamblen County ("the Juvenile Court") terminated the parental rights of Josue O. ("Father") to his daughter Neyra S. ("the Child"), finding multiple grounds applicable to a putative father, pursuant to Tenn. Code Ann. § 36-1-113(g)(9), and the ground of failure to manifest an ability and willingness to assume custody, pursuant to Tenn. Code Ann. § 36-1-113(g)(14). Father does not contest the Juvenile Court's findings of statutory grounds for termination but appeals the Juvenile Court's determination that termination of his parental rights was in the Child's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Lyndon King, Kodak, Tennessee, for the appellant, Josue O.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## <u>Background</u>

This case began in January 2024 when the Tennessee Department of Children's Services ("DCS") filed a petition for temporary legal custody of the Child a few weeks after her birth. DCS alleged that the Child's mother, Neyra M.-S. ("Mother"), tested positive for amphetamine and THC upon admission to the hospital to deliver the Child.[1] Mother subsequently consented to a urine drug screen which revealed positive results for oxycodone, opiates, and "MDMA." The Child's "cord stat drug test" was positive for methamphetamine.

At a Child and Family Team Meeting a few days after the Child's birth, Mother identified Father as the Child's father. On the same day, DCS contacted Father, who allegedly acknowledged that he was the Child's father. Father agreed to meet the child protective services investigator later that day but then had to cancel the meeting due to his work schedule. DCS alleged that the Child was dependent and neglected and a victim of severe child abuse.

The Juvenile Court entered a protective custody order, finding probable cause that the Child was dependent and neglected because of the Child's cord stat drug test result and Father's failure to "avail himself to DCS." The Juvenile Court placed the Child in DCS's temporary legal custody.

The Juvenile Court then entered a preliminary hearing order, suspending Mother's and Father's contact with the Child until they could pass two consecutive drug screens and granting DCS the authority to modify visitation. A week later, Mother stipulated that the Child was dependent and neglected.

In April 2024, the Juvenile Court entered an order adjudicating the Child dependent and neglected; finding that it was contrary to the Child's welfare to remain in the care, custody, or control of Mother and Father; and adjudicating the Child a victim of severe child abuse by Mother. Father did not appear at the adjudicatory hearing despite service, and the Juvenile Court found that Father had not shown interest in the matter. Father was ordered to pay $50 per month in child support. The Juvenile Court reiterated the no-contact provision from its preliminary hearing order.

While there is no evidence the no-contact provision was amended or rescinded, Father began supervised visitation with the Child in August 2024. In December 2024, the guardian *ad litem* ("GAL") filed a motion to suspend Father's visitation with the Child.

---

[1] Mother is not a party to this appeal but will be discussed as necessary for context.

The GAL alleged that Father had been allowed supervised visitation with the Child, but Father had recently tested positive for methamphetamine and amphetamine. The Juvenile Court entered an order suspending Father's contact with the Child.

In July 2024, DCS filed a petition to terminate Father's parental rights. DCS alleged that Father had failed to establish and exercise paternity, pursuant to Tenn. Code Ann. § 36-1-113(g)(9). With respect to this ground, DCS specifically alleged that Father had not legitimated the Child, had failed to make reasonable and consistent child support payments, had failed to seek reasonable visitation with the Child, had failed to manifest an ability and willingness to assume custody of the Child, had failed to file a petition for paternity, and would pose a risk of substantial harm to the Child's welfare. DCS further alleged the ground of failure to manifest an ability and willingness to assume custody, pursuant to Tenn. Code Ann. § 36-1-113(g)(14), and that termination of Father's parental rights was in the Child's best interest.

Trial was held in February 2025. Suleima Silva ("Silva"), the DCS case manager assigned to the case from September 2024 to a week prior to trial, testified. According to Silva, Father took a paternity test in February 2024, which revealed he was the father of the Child. Father did not submit this DNA test to the Juvenile Court at any time. With respect to Father's visitation with the Child, Silva testified that he exercised visitation from August 2024 to November 2024. In this three-month period of visitation, Father missed four visits, two for being sick and two for failing to confirm 24 hours ahead of time.

Silva testified that when Father would try to hug the Child, she would back away or start crying because she did not know him. The visits went "okay" when the Child's foster mother helped out. However, when the Child's foster mother was not there, the Child "just cried, and cried, and cried." When "foster mom wasn't in the picture[,] it was chaos." She estimated that Father had eight to ten visits with the Child. Silva affirmed that the Child does not know Father and feels uncomfortable with him. Silva's main concern was Father's lack of relationship with the Child. She testified that there is no parent-child bond between Father and the Child.

The last visit in November 2024 had to be canceled because Father tested positive for methamphetamine and amphetamine at the visit, leading to the suspension of his contact with the Child. This was the first drug screen administered. Previously when DCS would reach out to him about scheduling a drug screen, Father would not answer or would say he could not arrange a time to take the drug screen because of his work schedule. Despite being asked, Father did not provide DCS with a list of days he did not have work. Silva explained that Father never submitted any clean drug screens; that she tried to contact him in December 2024 to submit to another drug screen, but he did not respond; and that when he did return her call, it was after hours. However, she clarified that another DCS case worker administered a drug screen for Father in January 2025 and

that Father tested negative for illegal substances. However, she later testified that he tested positive for methamphetamine in January 2025.

In terms of child support, Silva testified that Father had made consistent child support payments since April 2024. He had not yet made a payment for February 2025. She also stated that Father would bring toys and diapers to visits.

With respect to the Child's foster home, Silva testified that the Child has been in the same foster home since entering DCS's custody in January 2024. Silva, who conducts monthly visits at the foster home, testified that the Child is "very attached to her foster mom" and "when she sees foster dad, she immediately starts kind of crawling or lifting her arms so that foster dad can like carry her." The Child has also grown attached to the other three children in the foster home. According to Silva, the Child has no relationships with any biological relatives.

Silva testified that Father's permanency plan responsibilities included submitting to random drug screens; securing housing, income, and transportation; visiting the Child; and completing a parenting assessment. He did not complete the parenting assessment because his contact with the Child was suspended before it was scheduled. Silva visited Father's home in January 2025, and she described it as safe. Father provided her with a letter of employment, but his employment could not be validated. She asked Father for a copy of his license and car registration, but he could not provide these.

In terms of services offered to help Father, Silva explained that DCS provided drug screens for him to take and that she would remind him of the deadlines for these. He missed two scheduled drug screens. She offered him help with the visits. DCS also would have paid for the parenting assessment. Silva testified that the previous case manager for the Child set up visitation, tried to contact Father to schedule drug screens, and tried to help Father establish paternity; she tried reaching out to him with no success, ultimately concluding she must have had the wrong number.

Jeremy M., the Child's foster father, ("Foster Father") testified that the Child has been in his and his wife's care since January 2024. The Child refers to him as "dada" and his wife as "momma." Foster Father testified that the Child has physical therapy once a month and behavioral therapy once a week. The Child also goes to a Tennessee Early Intervention Services program called "Grow with Me" once every three months. Father has never participated as a parent in any of these therapies or attended any of the Child's check-ups, despite being notified beforehand.

Father testified that he learned the Child was his child around April 2024. When asked to explain why it took him so long to start visitation with the Child, he blamed one of the DCS case workers for telling him that he could not visit the Child until DCS authorized him and that he was not allowed to visit the Child until he took a DNA test.

- 4 -

When asked again why he did not visit the Child before August 2024, he said he did not know about the baby.  However, at one point, he testified that he was present at the preliminary hearing in January 2024, despite other times in his testimony denying knowledge of the hearing. He affirmed that he submitted to a DNA test in February 2024. He stated that he felt that his access to the Child had been restricted by DCS.  Father's testimony was often unclear.

He testified that he is adequately employed and has a safe home.  However, he later acknowledged that he could no longer stay in the home he has with his wife and their daughter due to the failed drug screen in November 2024 and resulting no contact order with respect to his other daughter.[2]  He acknowledged that he tested positive for methamphetamine again through a subsequent hair follicle screen.  At the time of trial, Father was living in a small room in a friend's basement.  He testified that he stopped using methamphetamine sometime last year and is in a drug treatment program.  As of the time of trial, he had not told anyone at the treatment program about his recent failed drug screens.

Amy Spears ("Spears"), a Court Appointed Special Advocate ("CASA"), testified that she was appointed to the case in October 2024.  The Child was very friendly to her and let her hold her during her first encounter with the Child.  However, when Father arrived for the visit, the Child tensed up, grabbing Spears's clothes with her fists.  When Spears tried to hand the Child to Father, the Child refused to go to him and started crying. In her three years of being a CASA, this was the first time she had witnessed something like "that to that degree."  She testified that Father attended eight out of fourteen scheduled visits.

In contrast, Spears testified that the Child views her foster parents as "her safety" and that she is very bonded to them.  She stated that she thought it would be traumatic for the Child to be removed from her foster parents.  According to Spears, the Child does not know Father, and she was terrified of him.

In March 2025, the Juvenile Court entered a judgment terminating Father's parental rights.  The Juvenile Court made the following relevant findings of fact:

**GROUND II: Failure to Establish and Exercise Paternity**
**(Applies to Father)**

> The Court heard ample testimony regarding each of the subsections in this ground.  Father did submit to DNA testing after notice that the child might be his, but took no further action to legitimate.  However, Father did

---

[2] Father's wife is not the mother of the Child.

begin making child support payments which testimony showed were consistent and undisputed.

i. The Court finds that the Father was making child support payments starting in April of 2024. Those payments have been consistent through at least January of 2025, as Father testified that he would need to pay his support for the next three months in February. The Court finds that this subsection of this ground for termination of parental rights has not been proven.

ii. Father did not have visitation prior to the filing of the petition to terminate parental rights. Father began visiting shortly after the petition was filed and testimony showed that he exercised some 8 or 10 visits before they were suspended when he failed a drug screen for methamphetamine. While the Father's visitation after the filing of the petition was reasonable, considering that he was offered as many as 12 and made at least 8, this ground specifically requires the court to consider the actions of the Father taken *prior* to the filing of the petition to terminate parental rights. At the time of the filing, Father was not visiting. This is a prime example of what courts call "too little, too late." The Court finds that this subsection of this ground has been proven by clear and convincing evidence.

iii. Father, at the time of the filing, had not manifested a willingness to parent this child. While he did submit to his DNA testing in February of 2024, he did not begin visiting or engaging with the child until August of 2024. The Court would find that his actions *after* the filing of the petition to terminate parental rights began exhibiting a willingness to parent the child - Father began visiting and completed a couple of assessments for DCS. However, even when Father began to manifest some willingness, he then failed a drug screen for methamphetamine and his visitations were stopped. Nonetheless, at the time of the filing, testimony shows that Father had not exhibited a willingness to parent this child. The Court finds that this subsection of this ground has been proven by clear and convincing evidence.

iv. The Court heard testimony that the child exhibited a great amount of anxiety regarding the Father at visitation. The Court finds that the child's negative reaction to the Father is indicative of psychological harm that the child would endure if the child was placed in the Father's care. The Court finds that this subsection of this ground has been proven by clear and convincing evidence.

- 6 -

v. Although the Court heard testimony that the Father did submit to a DNA test in February of 2024, the Court has no proof that Father followed up on the initial DNA test by petitioning a court for legitimation. The Court finds that this subsection of this ground has been proven by clear and convincing evidence.

**By clear and convincing evidence, the Court finds that the requirements of Tennessee Code Annotated § 36-1-113(g)(9) have been met.**

### GROUND III: Failure to Manifest an Ability to Parent
### (Applies to Respondents)

\* \* \*

As to Father:

The Court looks at this ground differently than the analysis of the subsections to the second ground discussed above. The Court here is looking at all evidence while the child has been in foster care, not just the Father's behavior prior to the filing of the petition to terminate parental rights.

The Father had a lot of inconsistencies in his testimony. Father did consistently state that he was not aware that the Mother was pregnant, but testimony as to when he learned that he had a child was much less consistent. According to the exhibits, Father attended a preliminary hearing on January 24, 2024, although Father expressed no memory of that hearing date. Father did not appear at the adjudication in April of 2024; Father did not appear to show any interest in the case at that time. Father has had the ability to contact DCS and inquire about his responsibilities. As evidenced by how helpful Ms. Silva has been to Father, DCS stood ready and willing to help Father. Father was able to visit 8 to 10 times when he finally became involved in the case.

The Court notes that those 8 to 10 visits were the beginning of manifesting a willingness to parent this child; however, the Court also heard testimony that those visits were uncomfortable for the child, presumably because the child had not seen the Father for 7 months prior to those visits. Then, even after some manifestation began, Father failed a drug screen for methamphetamine and had to stop visiting the child pending negative results on two subsequent drug screens. In total, Father

- 7 -

has simply not shown an ability to parent this child due to his lack of early involvement and his failed drug screen after he finally began visiting.

The Court makes further findings regarding the second prong. It is probably an understatement to say that the child was "uncomfortable" at visits, but the child clearly had no attachment to Father. The child does not know Father, but instead is bonded with the foster parents. The Court finds that there would be risk of substantial psychological harm to the child should she be placed with the Father. In addition, the Court is aware that the physical home of the Father is appropriate - but he is not currently living there. Father testified that he is currently living in a basement room at a friend's house because he has a no contact order with another child and cannot live in his home any longer. Therefore, the Court finds that the child would be placed at risk of further instability should [she] be placed with the Father and, as this Court often states, every child has a critical need for and deserves stability and permanency.

**By clear and convincing evidence, the Court finds that the requirements of Tennessee Code Annotated § 36-1-113(g)(14) have been met.**

**BEST INTEREST**

**\* \* \***

As to Father:

A. All children need and deserve stability. For this child, that stability is found with the foster parents, not with the Father. This factor weighs in favor of termination of parental rights.

B. It would be devastating at this point to remove the child from the foster parents. This is further evidence in this case by the child's anxious reaction to the Father. This factor weighs in favor of termination of parental rights.

C. Father has provided consistent support and does have a home; however, he is not currently allowed to be in his own home. There is no continuity or stability in Father's life right now. This factor weighs in favor of termination of parental rights.

D. The child had an anxious reaction to being around the Father. When the child was left alone with the Father, the visit was described as "chaotic." This child doesn't know Father. This factor weighs in favor of termination of parental rights.

E. The Father did try to visit with the child some, although that was eventually interrupted by a failed drug screen. However, he made efforts. This factor weighs against termination of parental rights.

F. The Court finds that this factor does not apply.

G. The Court finds that this factor does not apply.

H. The child has a healthy attachment to the foster parents in the absen[ce] of her biological parents. This factor weighs in favor of termination of parental rights.

I. There are no biological relationship[s] that will be served by the termination. In addition, the Court heard testimony that the child has a relationship with several other foster children in the residence. This factor weighs in favor of termination of parental rights.

J. Father testified that he is trying to make some changes because he is in a treatment program. However, Father failed a drug screen as recently as December of 2024, and it is clear to this Court that any change Father may have made could not be classified as lasting. This factor weighs in favor of termination of parental rights.

K. Father took advantage of visitation and participated in the assessments that DCS arranged for him. This factor weighs against termination of parental rights.

L. Ms. Silva made reasonable efforts to help the Father. There is no testimony regarding what DCS or Father did prior to Ms. Silva being assigned the case, but it is clear to this Court that the Father did not take this case seriously until the petition to terminate parental rights was filed. This factor weighs in favor of termination of parental rights.

M. When looking at the timeline for this case, it is clear that Father did not exhibit any urgency until the petition to terminate parental rights was filed. At the time that i[t] was filed, Father became active in the case. However, over the course of the proceedings, Father has simply not shown urgency

until it was too late.  This factor weighs in favor of termination of parental rights.

N. The Court finds that this factor does not apply.

O. The Court finds that Father has never provided care for this child.  This factor weighs in favor of termination of parental rights.

P. The child has physical therapy, behavioral therapy, and other needs; Father has not attended any appointments.  The cord stat drug screen for the child was positive for methamphetamine, so this Court is aware that she will require ongoing assessments and therapy necessary for her growth. This factor weighs in favor of termination of parental rights.

Q. While Father was showing some changes in his life after the petition to terminate parental rights was filed, he then failed a drug screen for methamphetamine.  There is no commitment to making a lasting home for the child based on his recent substance abuse.  This factor weighs in favor of termination of parental rights.

R. While the physical home environment would be appropriate per the testimony of Ms. Silva and Father, per Father's own admission he is not allowed to live at that home at this time.  This factor weighs in favor of termination of parental rights.

S. By all accounts, Father has made consistent child support payments since April of 2024.  This factor weighs against termination of parental rights.

T. The Court finds that this factor does not apply.

**By clear and convincing evidence, the Court finds that the factors enumerated in Tennessee Code Annotated § 36-1-113(i), as well as other factors considered by this Court, weigh in favor of termination of parental rights being in the best interest of the child.**

Father timely appealed.

### Discussion

Although not stated exactly as such, Father raises the following issue on appeal: whether the Juvenile Court erred in finding that termination of Father's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[5] Tenn. Code Ann. § 36-1-113(i).

that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate

- 13 -

parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Father does not challenge the Juvenile Court's findings as to any of the statutory grounds, we must review these findings anyway. *In re Carrington H.*, 483 S.W.3d at 511 ("[A]ppellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal.").

When DCS filed its termination petition, the relevant grounds for termination of parental rights were set out by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(9)(A) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The parental rights of a person who is not a legal parent at the time of the filing of a petition to terminate parental rights of such person, or if no such petition is filed, then at the time of the filing of a petition to adopt a child, is the putative father of the child, may also be terminated based upon any one (1) or more of the following additional grounds:

* * *

(ii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102;

- 14 -

(iii) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(iv) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(v) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(2);

(B)(i) For purposes of this subdivision (g)(9), "notice" means the written statement to a person who is believed to be the biological father or possible biological father of the child. The notice may be made or given by the mother, the department, a licensed child-placing agency, the prospective adoptive parents, a physical custodian of the child, or the legal counsel of any of these people or entities; provided, that actual notice of alleged paternity may be proven to have been given to a person by any means and by any person or entity. The notice may be made or given at any time after the child is conceived and, if not sooner, may include actual notice of a petition to terminate the putative father's parental rights with respect to the child;

(ii) "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father, or possible biological father, of the biological mother's child;

(C) For the purposes of this subdivision (g)(9), resuming or starting visitation or support after the filing of a petition seeking to terminate parental or guardianship rights or seeking the adoption of a child does not rectify a ground for termination pursuant to this subdivision (g)(9) and is not a defense to a ground for termination pursuant to this subdivision (g)(9);

* * *

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's

legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2024 to June 30, 2025).

With respect to the grounds for termination applicable to a putative father, the Juvenile Court found in part:

Although the Court heard testimony that the Father did submit to a DNA test in February of 2024, the Court has no proof that Father followed up on the initial DNA test by petitioning a court for legitimation. The Court finds that this subsection of this ground has been proven by clear and convincing evidence.

The evidence does not preponderate against these findings.

Tenn. Code Ann. § 36-1-113(g)(9)(v) provides that a putative father may have his parental rights terminated if he fails to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity. Father had notice of his alleged paternity of the Child by January 24, 2024, the date of the preliminary hearing after DCS filed a dependency and neglect petition. The Juvenile Court in its preliminary hearing order stated that Father was present at the hearing. Moreover, Father submitted to a DNA test in February 2024 and began paying child support in April 2024. Despite having knowledge of his potential paternity by January 2024 and definitive knowledge of his paternity by April 2024, Father never filed a petition to establish paternity. Therefore, clear and convincing evidence supports the Juvenile Court's finding of this ground for termination.

The additional grounds found by the Juvenile Court were: (1) failure to visit by a putative father; (2) failure to manifest an ability and willingness to assume custody by a putative father; (3) risk of substantial harm to the child's welfare by a putative father; and (4) failure to manifest an ability and willingness to assume custody under Tenn. Code Ann. § 36-1-113(g)(14). As instructed by *In re Carrington H.*, we have likewise reviewed the Juvenile Court's findings as to each of these additional grounds. The evidence does not preponderate against the Juvenile Court's findings relevant to those grounds. Each of the additional grounds were proven by clear and convincing evidence, and we affirm the Juvenile Court's judgment as to these grounds.

We next address whether the Juvenile Court erred in finding that termination of Father's parental rights was in the Child's best interest. When DCS filed its termination petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render

the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2024 to June 30, 2025).

The crux of Father's argument is that the Juvenile Court incorrectly weighed factor (L), whether the department made reasonable efforts to assist him in making a lasting adjustment. Father argues that DCS did not make any efforts to assist him until after the termination petition was filed.

The Juvenile Court considered the fact that there was no evidence of DCS's efforts to assist Father prior to Silva being assigned to the case, which was after the petition for termination was filed.[6] The Juvenile Court stated as much in his final judgment. However, the Juvenile Court also found that Father had likewise not taken this case "seriously until the petition to terminate parental rights was filed." The evidence does not preponderate against this finding. Father does not cite to any case, and we likewise have found none, that dictates that courts are limited to facts predating the filing of a termination petition when considering the best interest factors. In any event, even if this factor should have weighed against termination, this factor alone would neither outweigh all the other factors weighing in favor of termination, nor absolve or justify Father's months-long inaction.

Despite having notice that he was potentially the Child's father in January 2024 and taking a DNA test in February 2024, Father never filed a petition to establish his paternity of the Child. There is no evidence he ever tried to submit two clean drug screens in order to petition the Juvenile Court to rescind its no-contact orders. Although there was little evidence that DCS took steps to assist Father until after the petition was filed, Father himself did not take necessary steps to help himself and his case. Father's lack of interest in the Child and this case was further illustrated by Silva's testimony that Father initially referred to the Child as "baby" and had to ask the previous DCS case

---

[6] We note that there was some evidence of what the previous case worker did to assist Father. Silva testified that the previous case worker set up visitation, tried to contact Father to schedule drug screens, and tried to help Father establish paternity. Whether these efforts were exerted prior to the filing of the petition, however, is unclear.

worker what the Child's name was. He also could not recall the Child's birthday at trial, and he ignored scheduled drug screens despite reminders.

Father's inaction is compounded by the testimony regarding at least one failed drug screen by Father demonstrating his methamphetamine use. Father tested positive for methamphetamine use a mere few months before trial. At the time of trial, Father was living in a small room in his friend's basement due to an order prohibiting his contact with the daughter he has with his wife. Although Father visited the Child at least eight out of twelve to fourteen offered visits, the Child never warmed up to Father. The Child was "terrified" of Father.

Although there was no evidence that Father ever did anything to harm the Child during visits, the Child's negative reactions to Father and their lack of relationship nevertheless weigh heavily in favor of termination. As we have reiterated many times, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective," *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005), and that "when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child," Tenn. Code Ann. § 36-1-101(d).

In contrast to the lack of any relationship between Father and the Child, the testimony presented at trial demonstrated that the Child was bonded to her foster parents and their children. Foster Father testified that the Child participates in various therapies, none of which Father attended despite being notified of these appointments. Removal of the Child from the only home and parental figures she has ever known and placing her with a practical stranger is not in the Child's best interest.

Given Father's initial lack of interest in this case, his methamphetamine use, the absence of any parent-child relationship, and other factors previously addressed, we agree with the Juvenile Court's best interest determination. The evidence does not preponderate against the Juvenile Court's findings, and we, likewise, conclude that clear and convincing evidence established that termination of Father's parental rights was in the Child's best interest. We affirm.[7]

---

[7] We note that DCS argues that the Juvenile Court erred in failing to weigh factor (K) (whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions) against termination. Although Father did avail himself of visitation after the petition was filed, we agree with DCS that there was no evidence regarding Father's completion of any assessments. Nevertheless, the Juvenile Court's factual error with respect to this factor did not change the outcome of its best interest determination, and it does not change the outcome of this appeal either.

## Conclusion

For the foregoing reasons, we affirm the Juvenile Court's judgment and remand for collection of costs below. Costs of the appeal are assessed against the appellant, Josue O., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE